Dear Judge Pitlyk,

I have spent many sleepless nights contemplating my choices and decisions over the course of the past three years, overwhelmed by the disappointment and regret that only hindsight can bring. I worry that my words will fall short and fail to convey my true feelings about my actions and the following events, but all I can do is write from the heart and trust that my words will find their purpose.

I have never referred to my parents as "adoptive." I know nothing of my birth parents, except that my mother was a teenager who struggled with substance abuse. I had the benefit of growing up in a small town, surrounded by loving members of my extended family. In all but one regard, my upbringing represented the best of what a childhood can be—a loving and supportive household, wherein my physical and emotional care, growth, and development were placed at the forefront of our family unit.

When I was nine to ten years old, I was sexually abused and molested by a family member on numerous occasions over the course of a year. She assured me that if I ever revealed what was happening, our entire family would believe me a liar and cast me aside because, being adopted, I was not really a part of our family. Finally, I broke down and revealed the truth to my parents. Although I am sure I found relief in the end of the abuse, I have no distinct memory of feeling as much. I remember feeling utterly alone and completed closed off from those people in my life who I had trusted to protect me. The abuse was never spoken of again by my parents, or by any family member. Every member of my family continued on as if the abuse had never happened. The silence showed that I could not look to others for answers, even when my need for guidance was at its most desperate. It instilled a shame in asking for help and expressing my true feelings; a certainty that I must conceal my needs and emotions from others.

For as long as I can remember, I have always wanted to be a part of the legal profession. While in college, I completed two internships with the St. Louis City Circuit Court. These internships reaffirmed this desire and I decided to take a leap of faith and apply to law school. Having maintained a 30-hour per week job to support myself while double-majoring at SLU, I had faith that my work ethic would help me to find success despite the momentous financial burden law school would entail. Only one law school offered me a scholarship and, although it was only a small portion of the overall cost, I seized the opportunity. I applied for the loans necessary to fund the remainder and found myself pursuing my passion at James Cooley Law School in Lansing, Michigan a few months after graduating from SLU.

My daughter was born one month into my first semester of law school. Admittedly terrified in the months leading up to her birth, my fear was quickly overcome by the joy of fatherhood when I held her for the first time. From that moment on, despite maintaining a full courseload and completing three clerkships, I spent nearly every weekend making the 16-hour round trip drive from Lansing to St. Louis so I could be as present for her early years as possible. I moved back to St. Louis after graduating from law school and passing the Missouri Bar, to pursue employment near her. My daughter's mother and I worked together to establish a productive coparenting relationship. Despite my education and experience, it was not an easy feat to find and secure an entry/associate level position with a law firm at this time. In the

months after returning to St. Louis, I worked as a document review attorney, while also maintaining two jobs at local restaurants, to support myself while sending out endless resumes and spending as much time with my daughter as possible.

After much consideration, I decided to accept a position with Martin and Grayson and moved to Jefferson City to begin building my professional dream. Among various other responsibilities, I was appointed to serve as the Guardian Ad Litem for all child protective orders filed in the Circuit Court of Cole County, Missouri. My meetings with each of the parents and especially the children subject to these filings were what sparked my initial passion for family law. Although I was not actively applying at the time, I had made it known to the partners of Martin and Grayson prior to my employment that my long-term goal was to return to St. Louis so I could be fully present in my daughter's life. A year into my employment in Jefferson City, I returned to St. Louis to begin my employment with Menees, Whitney, Burnett, and Trog.

This job was everything I had dreamed of for my young career—working under a respected and experienced trial attorney in a small, family-oriented law firm which rivaled the large firms in quality of services. To this day, I have immense respect for Hardy, his achievements in the field, and the practice he was able to build, and unending gratitude for the opportunity that he gave me. I will never have a greater regret than that for the damage I caused to him, personally and professionally, to the law firm I called home for five years, and to all the members of that firm, who I called my family. I will carry the shame of victimizing Hardy, and that family, for the rest of my life. After two years, my efforts and dedication were rewarded when I was named partner after the retirement of Whitney and Burnett. Other than the first time I held my daughter, I have never been prouder than the moment I first looked upon the business cards bearing the firm name, "Menees, Menees and Wynne."

My crimes, and the choices I made at Menees, Menees and Wynne were the product of longstanding mental health struggles, years of substance abuse, and coalescing personal and professional difficulties, the combination of which caused me to take indefensible actions in an effort to satisfy my professional responsibilities. I want to be absolutely clear and resolute in my statement and acceptance of responsibility for my choices and actions herein. I chose to use drugs and alcohol to cope with my mental health struggles instead of seeking professional help. I chose to remain silent about my need for help in managing my professional responsibilities and to keep secret my need for help in addressing my addiction and mental health issues. I chose to use deceitful, inexcusable acts in an effort to resolve my struggles and cover the consequences of my decisions and I chose to betray the trust of all those who placed their faith in me and depended on me for guidance and support in their most vulnerable moments.

Since early 2017, I was aware that my personal issues with addiction, depression, and anxiety had escalated to a dangerous, destructive level. I know that I had lost any semblance of control over my amphetamine addiction, and it became a daily struggle to hide my amphetamine and alcohol abuse from my family and friends. I was working until 7, 8 or 9:00pm almost every night, fueled by my stimulant use, then quickly consuming one of the half pints of vodka I had hidden in my closet as soon as I got home to take the edge off. I had never been more disgusted with, or ashamed of, myself and my behavior. Yet, I could not stop the pattern of actions or the substance abuse that fueled them. Every night, I laid awake and thought about how unsustainable

2

my lifestyle had become, how I could feel my body physically deteriorating from the daily abuse, how all-consuming my addiction had become, how desperately I needed to break free from my drug and alcohol use, and how all I needed to do was say something, to have one conversation to stop the cycle and ask for help before it was too late for the damage to be undone. In spite of the above feelings, I never told a single person about my substance abuse or struggles with my mental health. I had become so adept at presenting as the affable, easy-going, hardworking and successful friend, son, employee, and boyfriend that no one stood a chance of discovering my secret without my interjection.

After being named a partner at Menees, Menees and Wynne, the implosion began to rapidly accelerate. After taking over as managing partner of all of the firm's domestic/family law cases, the ten-hour days turned into eleven and twelve-hour days. The one or two weekend days in the office each month turned into constantly fielding phone calls and text messages on my cell phone after hours every day and all day each Saturday, as well as coming into the office one or two Sundays each month. The efforts necessary to manage and cope with my professional responsibilities increased significantly, which resulted in a corresponding increase of my substance abuse and the level of deceit necessary to keep my drug and alcohol abuse a secret. The consequence of these increases was a progressively significant decline in my mental health, despite my continued professional success and the outward display of pride in my career advancement.

To the outside world, I had reached a level of success rare for a thirty-year-old lawyer, especially one who attended a T-3 law school while simultaneously becoming a father. Internally, however, the foundations of my life were crumbling beneath my feet. My relationship with my girlfriend was suffering more than ever, as I was rarely home and lacked the energy to be fully present for her when I was. My relationship with my daughter also suffered greatly, as I would often have to work late on days I was to pick her up. I had reached a point where years of heavy drug and alcohol abuse was impacting my physical health. Due to the stressors of my workload I remained in a perpetual state of anxiety, constantly feeling like I was unable to get a grip on my daily obligations despite eleven and twelve hour workdays. Every day became a constant personal and professional battle to hide my secret and keep my silence, and this battle came to consume my life—I never felt as though I had a moment to breathe or to relax and simply enjoy my friendships, relationship, or fatherhood.

As my addiction and professional struggles reached a fever pitch, two other events occurred which facilitated my complete derailment. We closed our office and began working from home due to the Covid-19 pandemic, and contemporaneously my girlfriend of eight years and I separated. I was wholly and completely alone for the first time in my entire life, having lived with roommates and/or my long term partner at all times since leaving home for SLU fifteen years prior One of the few reasons I was able to maintain control over my professional life up to this point was the support provided by working in an office.

My Adderall consumption increased and my daily alcohol consumption skyrocketed. I began drinking during the day to contain my emotions and ease the burden of my professional obligations. Under the influence of alcohol, my ethics, morals, and internal sense of right and wrong quickly deteriorated in exchange for the easiest approach. I began to tell small lies to

clients when they asked about the prospect of their case in light of the closure of our office and the courts, assuring them all would be fine and continue moving forward as usual, in an effort to quickly and agreeably conclude such conversations. After a month or two of these misrepresentations, I began to take actions to support the lies, now completely numb to any sense of consequence and morality. I entered into an inexcusable pattern of manipulating and falsifying emails and documents simply to alleviate the stress and anxiety of my daily responsibilities.

From the outside looking in, I am certain it seems impossible to understand how I could take such actions despite the eventual and obvious consequences. When I started this pattern of behavior, however, I rarely gave a moment's thought to the potential consequences, as my goal was simply to hold it together as my addiction, depression, and drug use fought to overrun and destroy my life. By the time we returned to the office, I was too far buried under the need to maintain my lies to change my behavior, and saw no way out that did not involve sacrificing everything I had worked so hard to obtain by way of shame and grief for myself and all involved. Despite all of these failings, as only a mind warped by addiction can do, I still held out hope that I could fix all of my mistakes and remedy my lies without causing any permanent, lasting damage to my clients or our law firm. I clung desperately to this belief, and continued taking any surreptitious actions necessary to make it a reality, until my world came crashing down in July 2021.

Eventually, as your Honor is aware, a client noticed discrepancies in documents I had provided to her versus what was in the court filings of her case. In a very difficult staff meeting, I admitted to my actions and finally disclosed the secret of my substance abuse. That same morning, I voluntarily check in to CenterPointe in St. Charles, Missouri, for professional substance and rehabilitation services. While at CenterPointe, the firm continued its investigation and came to understand the depths of my deception and I was terminated from my employment a week or so into my inpatient treatment. As difficult as it was to relinquish my career, the termination of my partnership served as a release of the professional stress that I had lived under for many years. Upon my release from treatment, many staff members approached me to voice their belief that I would succeed in my sobriety and recovery. Unfortunately, at that time I had only focused on my addiction and had not addressed my underlying mental health issues.

Under the weight of two Bar complaints, a Bar investigation, and an FBI investigation, along with my failure to properly address my mental health issues, I again turned to drugs and alcohol to numb the pain of my situation. I had never used methamphetamine or fentanyl prior to September 2021 when I was introduced to them by someone I had attended CenterPointe with. Your Honor knows much of the story since that time, as I continued to do drugs to cope with the consequences of my actions and my mental health struggles. During this time I overdosed on fentanyl on three occasions and awoke only after being revived by paramedics—even still, I could not break from my addiction.

It is not an exaggeration to say that the intervention of the Court, in placing me in custody and then in inpatient at Preferred Family Health Care, saved my life. Further, the therapy services provided by PFH upon my release from treatment have been invaluable in acknowledging and treating my depression and anxiety, and in helping to maintain my recovery. Even so, I continued to struggle. I understand why your Honor remanded me back into custody

4

upon the submission of my plea agreement, and I am finally done running from the truth of my actions and choices over the past three years. Since being in custody, I have finally admitted the truth of my substance abuse and my actions which led to the filing of this case, to my friends, my family, and myself. It has been a difficult process, full of emotional conversations and the disappointment of those closest to me, but the breaking of my silence and disclosure of my secrets has finally allowed me to accept the circumstances of my life and to look toward a future of making amends.

I cannot adequately express the remorse I feel for the pain and difficulties my actions caused for my clients, Hardy and the other members of our law firm—people who I truly cared for. The personal consequences of my actions feel endless—I have destroyed my career, my relationships with my daughter, my former partner, my friends, and my parents, the value of my education, and my financial future. However, I brought these consequences upon myself and I deserve to bear the weight of them. But my victims did not deserve to suffer the consequences of my actions and I will never have the words to describe how truly sorry I am for bringing these consequences upon them by my selfishness. Never would I have imagined that my personal turmoil could have such a devastating impact on the lives of so many others and never will I forgive myself the choices I made caused such harm to those who trusted me.

However, I am ready to dedicate the same level of hard work, effort, and commitment to my sobriety and again becoming a productive, trustworthy member of society that I once dedicated to my education and building my career. I have been attending Narcotics Anonymous while in custody. I am anxiously awaiting the opportunity to attend cognitive therapy, behavioral therapy and drug abuse treatment programs, among others. I know that I will have to work every single day for the rest of my life to maintain my sobriety, rebuild my relationships, and make amends for my crimes. My goal is to use the resources to their full potential and to use my progress in these programs to set the tone for the man I want to be for the rest of my life. I hope to ultimately dedicate my life to helping others by working as a peer counselor at a treatment center for addiction and substance abuse and use my experiences to provide help and guidance to others who are suffering from addiction and struggling with their mental health—to use the worst decisions I have ever made and the most difficult time in my life to help better the lives of others who are in similar situations.

I am genuinely grateful to have begun the road to sobriety, recovery and improved mental health. I am wholly dedicated to making the most of the opportunities that may be made available to me and to using the rest of my life to make amends for my wrongs and the damage I have caused. I will do everything in my power to use this experience to become a better person than I was before.

Very Sincerely,

Andrew Gavin Wynne